UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**CURTIS E. HARRIS,**

        **Plaintiff,**

v.                                                     Case No. 06-C-529

**KEVIN G. CLARK, et al.,**

        **Defendants.**

## DECISION AND ORDER

Plaintiff Curtis E. Harris filed the present action pursuant to 42 U.S.C. § 1983 against Kevin G. Clark, a former Milwaukee police officer, and Joseph V. Schankey, a current Milwaukee police officer, alleging that Clark used excessive force against him during an arrest and rendered him a quadriplegic, and that Officer Schankey failed to intervene to prevent Clark from using such force. Before the court are defendants' motion for summary judgment and several related motions.

### I. FACTS

On December 10, 2003, at approximately 2:00 a.m., Clark and Schankey were performing regular patrol duties as City of Milwaukee police officers when they were dispatched to handle a complaint made by a woman about her brother, Harris. According to the complaint, Harris was in his sister's home, drunk, and threatening her safety and the safety of children who were also in the home. Clark and Schankey arrived at the home in separate squad cars. Although Harris denies that he was drunk (he claims to have consumed four beers over the prior ten-hour period), Officers Clark and Schankey state that he was highly agitated, that his words were slurred, that he smelled strongly of alcohol,

and that his eyes were glossy and bloodshot. Based on Harris's sister's complaint and his observation of Harris's verbally abusive and disorderly conduct, Clark decided to take Harris into custody.

The parties have radically different views of what happened next. According to defendants, Clark handcuffed Harris and escorted him out of the residence, keeping at least one hand on him at all times. Officer Schankey followed them out of the house. Harris was using profane language and pushing and pulling against Clark's grip on his arm. Once outside, Clark and Harris walked across a muddy footpath on the front lawn. Because of Harris's struggling against Clark's grip, Harris and Clark slipped on an incline in the pathway and fell to the ground. Neither Harris nor Clark were injured in the fall, but both got mud on their pants and shoes. Clark then placed Harris into the back of his squad car and transported him to the police station. Schankey followed in his own squad car.

According to Harris's version of the events that transpired at his sister's house, Clark was physically abusive from the start, even though Harris was being fully cooperative. Harris states that when he handed Clark his identification in response to Clark's request, Clark grabbed him by the arm, threw him to the floor, placed a knee on his neck, handcuffed him, and hoisted him up by the handcuffs. As Clark and Harris were descending the stairs of the house, Clark would let Harris fall down the steps a little bit and then pull him back up by the handcuffs. As they were crossing the muddy path on the front lawn, Clark said, "Nigger, I'm the one in charge here. Do you like mud?" Clark then pushed Harris into the mud, yanked him back up by the handcuffs, and placed him in the squad car. Harris claims that the push into the mud injured his leg, and that his wrists were cut from the chafing caused by Clark's yanking on the handcuffs.

When Clark and Harris arrived at the police station, Clark escorted Harris to the booking room. The booking room video camera (which recorded both video and audio) recorded everything that happened from this point until Harris was injured. However, the tape is of relatively poor quality and is largely unhelpful in resolving the parties' disputes over what transpired in the booking room.[1]

Upon their arrival in the booking room, Clark handcuffed Harris to a bench that ran along the wall. Another suspect was already being booked at the time Harris arrived, and thus Clark and Harris had to wait until the booking officer finished with this suspect before Harris could be processed for confinement. Processing the first suspect took about twenty minutes, and during this time Harris was being loud and profane, making derogatory and threatening comments towards the police officers present in the booking room. Harris can be heard on the tape using expletives and abusive language towards the officers, and at one point, he threatens to rape one of the officer's wives. Harris states that he was only complaining about being intentionally pushed into the mud by Clark earlier in the evening. Harris also states that he repeatedly demanded to see Clark's supervisor or sergeant, but that all of the officers in the booking room ignored his requests.

When it was time for Harris to be processed, Clark escorted Harris from the bench to a chair that was bolted to the floor in front of the booking officer's desk. Defendants state that Harris was uncooperative in the booking process, and that he refused to answer basic questions and would not remove items from his pockets for a routine custodial search. Because Harris could not be processed until a custodial search was completed,

---

[1] The tape is in the record as Exhibit KCA to Clark's affidavit.

Clark asked Harris to stand and walk a few steps to a nearby wall. Harris complied, and Clark asked him to place his hands against the wall. Clark and Schankey then conducted the custodial search.

Once the search was completed, Clark began to escort Harris back to the chair, walking behind Harris and keeping his hand on Harris's shoulder as he did so. Up to this point, Harris had not been physically aggressive to any officers, but Harris's constant derogatory and abusive speech towards the officers caused Clark to be on his guard. As Clark was escorting Harris back to the chair, Clark observed Harris planting his feet and felt the muscles in his shoulder clench. He then saw Harris's right arm make a sudden movement. Clark concluded from Harris's movements that Harris was attempting to throw a punch at him, and that to protect himself from the punch, he needed to "decentralize" Harris.[2] Clark decentralized Harris by grabbing hold of Harris's right fist and arm, thereby blocking the punch, and he twisted Harris's body out and downward in order to throw him off balance and bring him to the floor.[3] In the process of twisting Harris to the ground, Clark smashed Harris's head into a nearby wall. The tape depicts this incident occurring in a fraction of a second, and it appears from the tape that Harris hit the wall with extreme force. Officer Schankey was standing nearby, but was not otherwise involved in the decentralization maneuver. Clark states that he did not intend for Harris's head to strike the wall.

---

[2] In police terminology, to "decentralize" a subject means to direct the subject to the ground. (Ex. 1 to Basting Dep. at p. 42.)

[3] The parties describe the maneuver used by Clark as an "off-the-tracks" decentralization.

4

Harris has a different view of the events that led up to the decentralization. According to Harris, after the custodial search was completed, Clark asked him to walk back to the chair while keeping his hands in the air. Harris claims that he complied, and that while he and Clark were walking back to the chair, Clark put his hand on Harris's shoulder and began pushing him. In response, Harris told Clark that "All you got to do is ask me what you want me to do." This statement can be heard on the tape. However, Clark continued to push Harris, which caused Harris to begin losing his balance. As Harris attempted to steady himself from the push, Clark performed the decentralization maneuver and threw Harris's head into the wall. According to Harris, he never made a fist and had no intent to punch Clark. He argues that all of the bodily movements that can be observed on the tape were caused by Clark's pushing him and Harris's attempt to steady himself. Harris claims that after Clark decentralized him to the ground, Clark hovered over Harris, placed his knee on Harris's neck, and called him a motherfucker. Clark denies that he put his knee on Harris's neck or called him a motherfucker.

After Harris was on the ground, the officers observed blood on the floor and that Harris's forehead was bleeding profusely. They concluded that Harris's head had been lacerated by the sharp edge of the wall's molding. They concluded that, other than this laceration, Harris was not injured. However, Harris was making crying noises (which are audible on the tape) and was in obvious pain. Clark then informed the acting lieutenant at the station that he had used force and injured a suspect. Clark also instructed the booking officer to contact emergency medical personnel. When paramedics arrived, Harris stated that he was paralyzed. The officers believed that Harris was exaggerating his pain and symptoms in order to avoid going to jail, and Harris claims that they mocked and

laughed at him while he was on the ground.  Eventually, Harris was transported to a hospital and had emergency surgery on his neck.  The doctors determined that when Harris's head hit the wall, he sustained a severe spinal cord injury.  He is now an incomplete motor quadriplegic, which means that he can move his arms somewhat but cannot move his legs or fingers.  The record contains some evidence that Harris had a preexisting spinal condition that may have contributed to the severity of his injuries.  However, resolving all factual disputes in Harris's favor, I assume for purposes of this motion that Harris's quadriplegia was caused solely by the force with which Clark drove Harris's head into the wall.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis deleted).  For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id.  For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." Id.  In evaluating a motion for summary judgment, I view the evidence in the light most favorable to the non-movant, resolving all factual disputes in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Plaintiff asserts a Fourth Amendment excessive force claim against Clark, claiming that Clark intentionally threw Harris's head into the wall without reasonable justification. Harris also brings a Fourth Amendment "failure to intervene" claim against Officer Schankey, arguing that Schankey should have intervened and prevented Clark from decentralizing him. I consider each claim separately.[4]

**A.      Officer Clark**

The parties agree that the legal standard governing plaintiff's excessive force claim is the Fourth Amendment "reasonableness" standard described in <u>Graham v. Connor</u>, 490 U.S. 386 (1989). Under this standard, the ultimate question for the jury is whether the officer used unreasonable force against the plaintiff. <u>See</u> <u>Federal Civil Jury Instructions of the Seventh Circuit</u> § 7.08.[5] Determining whether a use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Graham</u>, 490 U.S. at 396 (internal quotation marks omitted). Because "the test of reasonableness . . . is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each

---

[4] I note that plaintiff does not bring a separate excessive force claim against Clark for the incidents that allegedly occurred at Harris's sister's house, such as being thrown in the mud and yanked around by the handcuffs. Also, although plaintiff originally brought Eighth and Fifth Amendment claims in addition to his Fourth Amendment claims, the parties agree that plaintiff's claims arise exclusively under the Fourth Amendment (as incorporated in the Due Process Clause of the Fourteenth Amendment).

[5] The pattern jury instructions are available at the Seventh Circuit's website: http://www.ca7.uscourts.gov/Pattern_Jury_Instr/7thcivinstruc2005.pdf.

7

particular case." Id. (internal citation and quotation marks omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. Likewise, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly-evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97.

The "'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. However, "in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." Id. at 399 n.12.

Applying the above standards to the facts of this case, it is clear that whether Clark used excessive force against Harris is a question to be resolved at trial. Clark claims that he decentralized Harris because he reasonably thought that Harris was about to punch him. Harris denies that he made any bodily movements that could have been reasonably perceived as a punch, and that the bodily movements observed on the tape were caused when Clark pushed Harris in the back and then began the decentralization maneuver. The tape itself is inconclusive. After the jury listens to the testimony of all those present in the

8

booking room, including Clark and Harris, and views the videotape, it could reasonably conclude that Clark reasonably perceived that Harris was going to throw a punch, but it could also reasonably conclude that a reasonable officer would not have thought that Harris was going to throw a punch. The jury could reasonably conclude that Clark simply snapped and threw Harris's head into the wall because he could no longer take Harris's verbal abuse. Therefore, whether Clark's use of the decentralization maneuver was unreasonable depends on the jury's resolution of genuine issues of material fact.[6]

Clark argues that even if his use of force against Harris was unreasonable, he is entitled to qualified immunity. Governmental officials performing discretionary functions are immune from liability for damages under § 1983 unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "gives public officials the benefit of the legal doubts" when they make official decisions. Elliott v. Thomas, 937 F.2d 338, 341 (7th Cir. 1991). All officials, save the "plainly incompetent or those who knowingly violate the law" are protected by qualified immunity. Malley v. Briggs, 475 U.S. 335, 341 (1986).

In the context of an excessive force claim, a plaintiff may defeat a qualified immunity defense by

---

[6]Having concluded that whether Clark reasonably perceived that Harris was about to throw a punch depends on the resolution of disputed questions of fact, I need not identify other genuine issues of material fact pertaining to Clark's liability. However, I note that there are many other such issues, including (but not limited to) whether Clark intentionally (rather than accidentally) threw Harris's head into the wall as part of the decentralization maneuver. My present decision should not be interpreted as precluding Harris from pursuing any of these factual issues at trial.

9

> "(1) pointing to a closely analogous case that established a right to be free from the type of force the police officers used on him, or (2) showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment."

Chelios v. Heavener, 520 F.3d 678, 691 (7th Cir. 2008) (quoting Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996)).

In the present case, plaintiff argues that when the facts of this case are viewed in the light most favorable to him, Clark's use of force was so plainly excessive that a reasonable officer would have known that he was violating the Fourth Amendment. I agree. As discussed, the evidence allows a reasonable jury to conclude that Clark intentionally threw Harris's head into a wall even though a reasonable officer would not have thought that Harris was about to throw a punch. Certainly all reasonable officers know that they cannot intentionally throw a suspect headfirst into a wall when the suspect has not attempted to use physical force against the officer, and defendants concede as much. (Defs.' Reply Br. at 5. ("Defendants do not dispute that if Officer Clark intentionally struck Mr. Harris' head into the wall as a means of gaining control over him, he would not be entitled to qualified immunity.").) Clark argues that no reasonable jury could view the videotape and conclude that he intentionally threw Harris's head into the wall or that Harris was not trying to punch him. However, the videotape is inconclusive and consistent with both Clark's testimony and Harris's testimony. Therefore, the jury must resolve disputed questions of fact before any conclusion can be reached as to whether Clark's use of force was plainly excessive. Accordingly, a trial is required before I can determine whether Clark is entitled to qualified immunity. See Chelios, 520 F.3d at 692 (stating that showing that use of force was plainly excessive requires a fair amount of factual development, and that

10

trial may be required before qualified immunity can be addressed); Abdullahi v. City of Madison, 423 F.3d 763, 774-75 (7th Cir. 2005) (stating that where very nature of officer's conduct remains undetermined, court cannot resolve qualified immunity defense prior to trial).

**B.     Officer Schankey**

As noted, Harris argues that Officer Schankey had a duty to intervene and prevent Clark from using excessive force against him. To succeed on this claim, Harris must prove the following elements:

1.   Officer Clark used excessive force;

2.   Officer Schankey knew that Officer Clark was about to use excessive force;

3.   Officer Schankey had a realistic opportunity to do something to prevent harm from occurring;

4.   Officer Schankey failed to take reasonable steps to prevent harm from occurring; and

5.   Officer Schankey's failure to act caused Harris to suffer harm.

See Federal Civil Jury Instructions of the Seventh Circuit § 7.16; see also Abdullahi, 423 F.3d at 774; Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000); Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 477 (7th Cir. 1997); Yang v. Hardin, 37 U.S. 282 (7th Cir. 1994).

Harris does not argue that Schankey should have intervened and prevented Harris's head from hitting the wall once Clark started the decentralization. The parties agree that Schankey had no realistic opportunity to intervene once the decentralization commenced, inasmuch as the entire maneuver lasted only one second. Nor does Harris argue that Schankey knew that Clark was about to decentralize Harris and should have stopped the

11

decentralization before it began. The tape makes clear that Clark performed the maneuver very suddenly and that Schankey would have had no reason to know that it was coming.

Instead of arguing that Schankey knew that Harris was about to use excessive force, Harris argues that, based on Clark's behavior towards Harris over the course of the arrest and booking, Schankey should have taken preventative measures to ensure that Clark was not in a position to use excessive force on Harris. That is, viewing the facts most favorably to Harris, I must assume that Clark used excessive force against Harris during the arrest – including when he yanked Harris around by the handcuffs and intentionally pushed Harris into the mud outside his sister's house – and that Schankey witnessed all of these events. Harris argues that witnessing these events would have caused a reasonable officer in Schankey's position to remove Clark from the scene or otherwise separate him from the suspect before he did something worse, such as ramming the suspect's head into a wall. Had Schankey taken such preventative measures, Harris argues, the decentralization would never have occurred.

Defendants do not bother to respond to this argument, making it difficult for me to evaluate it, and I am inclined to deny defendants' motion for summary judgment on that basis. However, plaintiff also fails to fully develop this argument. In particular, plaintiff cites no authority for the proposition that Schankey can be held liable under the Fourth Amendment for failing to prevent an excessive use of force that he did not know was about to occur. That is, all that a reasonable officer in Schankey's position would have inferred from Clark's conduct towards Harris throughout the evening was that Clark was acting in a manner that suggested that he might again use excessive force on Harris. However, there was no continuing application of excessive force that Schankey could have brought

12

to a stop. In this respect, the present case is distinct from a typical failure to intervene scenario, such as where an officer begins to beat a suspect and his partner stands idly by and lets the beating continue.

Thus, the most that plaintiff has shown is that a reasonable officer in Schankey's position would have been aware of a <u>risk</u> that Clark might use excessive force on Harris again at some point during the arrest and booking, and that a reasonable officer would have taken steps to prevent another such use of force from occurring. But plaintiff has cited no authority recognizing Fourth Amendment liability based on nothing more than an officer's disregard of a risk that his partner might apply some form of excessive force at some point in the future. And Seventh Circuit precedent recognizes Fourth Amendment liability only in cases where the standby officer <u>knew or should have known</u> that his partner was using or was about to use excessive force. <u>Abdullahi</u>, 423 F.3d at 774 (failure to intervene claim requires proof that standby officer "had reason to know" that excessive force was being used); <u>Lanigan</u>, 110 F.3d at 478 (same); <u>Yang</u>, 37 F.3d at 285 (same). Because plaintiff has not shown that Schankey's mere disregard of a risk that more excessive force was on the way can create Fourth Amendment liability,[7] Officer Schankey is entitled to summary judgment on this issue.

---

[7]Possibly, plaintiff could have argued that Officer Schankey was deliberately indifferent to a substantial risk of Clark's again using excessive force. See <u>Federal Civil Jury Instructions of the Seventh Circuit</u> § 7.11 (elements of Eighth or Fourteenth Amendment "failure to protect" claim). However, plaintiff has made no effort to show that Schankey's failure to act rose to the level of deliberate indifference (rather than simply negligence), and therefore I deem any such argument forfeited. Plaintiff has focused solely on Fourth Amendment "reasonableness" principles and never mentions deliberate indifference as a potential source of liability. (See, e.g., Pl.'s Br. in Opp. at 43 ("The <u>reasonableness</u> of Officer Schankey's failure to intervene is a jury question . . . ." (emphasis added, boldface type and capitalization removed)).)

13

Harris makes one last, somewhat confusing argument in support of his failure to intervene claim. He argues that in the seconds before Clark performed the decentralization, Schankey witnessed Clark "put his hands" on Harris as Clark was escorting Harris back to the booking desk. (Pl.'s Br. in Opp. at 47.) Harris refers to a sequence in the video in which Clark puts his hand on Harris's shoulder as he is guiding Harris back to the desk. Harris argues that this "laying of hands" on Harris was itself an excessive use of force, and that Schankey should have done something to halt Clark's putting his hands on Harris. (Id.) Harris claims that had Schankey intervened and stopped the laying of hands, Clark would not have been able to decentralize Harris when he did.

However, Harris cites no authority and develops no argument showing that "laying hands" on a suspect while escorting him or her to a location within a booking room constitutes an excessive use of force that a standby officer must bring to a stop. Cf. Graham, 490 U.S. at 396 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." (internal citation omitted)). He cites only the opinion of his expert witness, who testified in a deposition that a standby officer should intervene when he sees his partner lay his hands on a suspect. (Waller Dep. at 37-38.) Waller does not explain this opinion, nor does plaintiff explain why it was objectively unreasonable for Clark to have put his hands on Harris's shoulder in the first place. In any event, only if Schankey physically separated Clark from Harris the moment that Clark touched Harris's back – something that surely would have been a disproportionate response to such an innocuous "use of force" – would we know with any degree of certainty that the decentralization would have been prevented. We simply do not know what would have happened had Schankey taken any lesser steps

14

to intervene, such as simply telling Clark to take it easy. It may be that Clark would have ignored Schankey and gone ahead with the decentralization anyway. Thus, unless the only constitutionally-appropriate response to the laying of hands was immediate physical intervention, no trier of fact could reasonably conclude that Schankey's failure to intervene <u>caused</u> Harris's quadriplegia – such a conclusion would be pure speculation. And because Harris does not establish that a reasonable jury could conclude that Schankey's immediate physical intervention was required, Schankey is entitled to summary judgment.

Finally, even if Harris could show that a reasonable jury could find that Officer Schankey's conduct violated the Fourth Amendment, Officer Schankey would be entitled to qualified immunity. Plaintiff cites no analogous case recognizing Fourth Amendment liability for failing to intervene when a standby officer does not know and has no reason to know that his partner is about to use excessive force. Likewise, he cites no case that clearly establishes the proposition that an officer has a duty to physically intervene when he sees his partner "lay his hands" on a suspect. Further, neither proposition would be obvious to a reasonable officer in the absence of analogous case law. Therefore, even if a reasonable jury could find that Officer Schankey violated the Constitution, Officer Schankey would be entitled to summary judgment based on qualified immunity.

**C.    Related Motions**

As a housekeeping matter, I address the various motions filed by the parties in addition to defendants' motion for summary judgment. First, defendants moved to strike plaintiff's brief as exceeding this District's page limitations, and plaintiff, in turn, moved for permission to exceed the page limitations. Defendants' motion is denied and plaintiff's is

15

granted. Second, each party moves to strike the testimony submitted by the other's expert witness regarding use of force. Because I have not relied on either witness's testimony in deciding the motion for summary judgment, I will deny each motion to strike as moot. Any issues regarding the admissibility of expert testimony can be dealt with through motions in limine.

## IV.  CONCLUSION

**For the reasons stated,**

**IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. All claims against defendant Clark shall be scheduled for trial, and all claims against Officer Schankey are dismissed.

**IT IS FURTHER ORDERED** that defendants' motion to strike plaintiff's responsive brief is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for leave to file excess pages is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' motion to strike the testimony of Dennis Waller is **DENIED** as **MOOT**.

**IT IS FURTHER ORDERED** that plaintiff's motion to strike the testimony of Stephen Basting is **DENIED** as **MOOT**.

**FINALLY, IT IS ORDERED** that a telephonic scheduling conference will be held on **December 10, 2008 at 10:30 a.m.** to schedule this matter for trial. The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 10 day of November, 2008.

/s
LYNN ADELMAN
District Judge